UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

F. ANTONE ACCUARDI,

        Plaintiff,

    v.

BRAD FREDERICKS,

        Defendant.

Case No. 3:13-cv-01825-ST

**OPINION AND ORDER**

**STEWART, Magistrate Judge:**

## INTRODUCTION

Plaintiff, F. Antone Accuardi ("Accuardi"), an Oregon attorney, filed this action against defendant, Brad Fredericks ("Fredericks") and several unidentified Internet users, based on statements made about Accuardi on Fredericks's Blog, The Telecom Compliance News Press, and other websites. The Blog is dedicated to informing the public about the illegal telemarketing industry. Accuardi alleges that Fredericks posted false statements about Accuardi's involvement in illegal telemarketing schemes that cast him as a dishonest, serial violator of state and federal law with questionable professional ethics. Based on those false statements, he alleges three claims under Oregon law for placing him in a false light, intentionally inflicting emotional distress, and intentionally interfering with economic relations.

Based on the filing of the First Amended Complaint (docket #38), which deleted the unidentified Internet users, this court has jurisdiction pursuant to 28 USC § 1332 based on complete diversity between the parties and an amount in controversy which exceeds $75,000.00. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #39).

Fredericks has filed an Amended Special Motion to Strike (docket #10) all claims pursuant to Oregon's Anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, ORS 31.150 *et seq*. Although this motion was filed against the initial Complaint, this court deems it also as filed against the First Amended Complaint. For the reasons that follow, Fredericks's motion is granted.

## STANDARDS

"A SLAPP suit is one in which the plaintiff's alleged injury results from petitioning or free speech activities by a defendant that are protected by the federal or state constitutions." *Vess v. Ciba-Geigy Corp. USA*, 317 F3d 1097, 1109 (9th Cir 2003). In response, a defendant in federal court may file a motion to strike under an applicable Anti-SLAPP statute. *Vineyard v. Soto*, 10-CV-1481-SI, 2011 WL 5358659, at *2 (D Or Nov. 7, 2011); *see also Thomas v. Fry's Elecs., Inc.*, 400 F3d 1206, 1206-07 (9th Cir 2005).

Oregon's Anti-SLAPP provisions "permit a defendant who is sued over certain actions taken in the public arena to have a questionable case dismissed at an early stage." *Staten v. Steel*, 222 Or App 17, 27, 191 P3d 778, 786 (2008). Pursuant to ORS 31.150, a defendant filing a special motion to strike against a claim:

> has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section. If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that

there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion.

A special motion to strike is treated "as a motion to dismiss under Or. R. Civ. P. 21 A and requires the court to enter a 'judgment of dismissal without prejudice.'" *Gardner v. Martino*, 563 F3d 981, 986 (9th Cir 2009) (applying Oregon law).[1]

Analysis of a special motion to strike is a two-step process. "First, the defendant has the initial burden to show that the challenged statement is within one of the categories of civil actions described in [ORS] 31.150(2)." *Gardner*, 563 F3d at 986. "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." *Mann v. Quality Old Time Serv., Inc.*, 120 Cal App 4th 90, 102, 15 Cal Rptr 3d 215, 220 (2004) (referring to the California Anti-SLAPP statute).[2] The required showing may be made on the basis of the pleadings alone. *Staten*, 222 Or App at 31, 191 P3d at 788.

If the defendant meets the initial burden, then "the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). In making this determination, "the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." ORS 31.150(4). The court must deny the motion "[i]f the plaintiff meets this burden." ORS 31.150(3).

---

[1] "Application of Oregon's anti-SLAPP statute, which requires entry of a judgment of dismissal without prejudice, does not create a conflict between the ORCP and the FRCP." *Gardner*, 563 F3d at 991, citing *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F3d 963, 972-73 (9th Cir 1999). The Ninth Circuit recently upheld *Newsham* under the *Erie* doctrine analysis articulated in *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 US 393 (2010). *Makaeff v. Trump Univ., LLC*, 736 F3d 1180, 1181 (9th Cir 2013) ("California's anti-SLAPP statute, by creating a separate and additional theory upon which certain kinds of suits may be disposed of before trial, supplements rather than conflicts with the Federal Rules.").
[2] Oregon's Anti-SLAPP statute is modeled after the California statute. *Gardner v. Martino*, CV-05-769-HU, 2005 WL 3465349, at *3 (D Or Sept. 19, 2005).

3 – OPINION AND ORDER

The parties dispute whether Fredericks has the additional burden of showing that Accuardi's intent in bringing the action was to chill protected speech. Accuardi argues that his claims survive an Anti-SLAPP motion because he did not intend to stifle Fredericks's First Amendment rights, but seeks only to remedy the harm suffered from allegedly malicious conduct. However, "[t]he defendant need not show that the plaintiff's suit was brought with the intention to chill the defendant's speech." *Vess*, 317 F3d at 1110 (internal quotation and citation omitted). Thus, Accuardi's "intentions are ultimately beside the point." *Id.*

## DISCUSSION

### I.    Fredericks's Burden

#### A.    Public Issue

Fredericks argues that his statements fall into two of the four categories of civil actions described in ORS 31.150(2):

> (c) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or
> (d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Fredericks's Blog clearly consists of statements made either "in a place open to the public or a public forum" or "in furtherance of the exercise of . . . the constitutional right of free speech." *Id.* First, Accuardi admits Fredericks's Blog is a public forum. Response (docket #19), p. 7. Moreover, courts applying the similar California Anti-SLAPP statute have found the Internet is accessible to anyone who chooses to visit the hosting website and "hardly could be more public." *Wilbanks v. Wolk*, 121 Cal App 4th 883, 895, 17 Cal Rptr 3d 497, 503 (2004). Particularly, "[w]ebsite forum pages allowing users to read and post comments free of charge constitute a public forum under the anti-SLAPP statute." *Higher Balance, LLC v. Quantum*

*Future Grp., Inc.*, CIV. 08-233-HA, 2008 WL 5281487, at *3 (D Or Dec. 18, 2008), citing

*ComputerXpress, Inc. v. Jackson*, 93 Cal App 4th 993, 1006, 113 Cal Rptr 2d 625, 638 (2001).

Second, "online speech stands on the same footing as other speech — there is 'no basis for

qualifying the level of First Amendment scrutiny that should be applied' to online speech."  *In re*

*Anonymous Online Speakers*, 661 F3d 1168, 1173 (9th Cir 2011), quoting *Reno v. Am. Civil*

*Liberties Union*, 521 US 844, 870 (1997).  The Internet "provides relatively unlimited, low-cost

capacity for communication of all kinds" and through its use "any person with a phone line can

become a town crier with a voice that resonates farther than it could from any soapbox."  *Reno*,

521 US at 870.

However, to meet his burden under ORS 31.150(2)(c) or (d), Fredericks also must show

his statements were made "in connection with a public issue or an issue of public interest."  The

statute does not define the terms "public issue" and "public interest."  As a general rule, Oregon

federal courts broadly interpret the terms in state statutes.  *See, e.g., Higher Balance*, 2008 WL

5281487, at *4; *Gardner*, 2005 WL 3465349, at *5.

Abuses within the telemarketing industry have garnered national attention and are

regulated by the Federal Trade Commission ("FTC") and other federal agencies under the

Telephone Consumer Protection Act, 47 USC § 227 *et seq*, enacted to regulate "commercial

telemarketing solicitations" using "automatic telephone dialing systems."  47 CFR

§ 64.1200(a)(2).  Between January 1 and October 22, 2012, Americans filed more than 3 million

consumer complaints about violations of the National Do-Not-Call Registry, a clearinghouse

maintained by the FTC of households that do not wish to receive telemarketing calls.  Fredericks

Decl. (docket #12), ¶ 7.  In fact, Accuardi does not contest that the topic of illegal telemarketing

is an issue of public interest but argues that his alleged professional association with telemarketing companies (whom and what he counsels) is not a matter of public concern.

Fredericks started his Blog in May 2012 out of frustration with receiving frequent unsolicited, prerecorded telemarketing calls ("robocalls"), despite having his name on the National Do-Not-Call Registry. *Id*, ¶ 3. The purpose of his Blog is "to disclose how illegal telemarketing is accomplished, how the companies and people involved make their money, and to encourage the public to report unsolicited telemarketing calls to regulatory agencies so that they can be properly investigated." *Id.* The Blog has received over 350 comments from Internet readers and tens of thousands of "views." *Id*, ¶ 5. The FTC granted Fredericks news media status in connection with his requests for documents related to Pacific Telecom Communications Group ("Pacific Telecom"). *Id*, ¶ 6 & Ex. 3.

Accuardi argues that the Blog is not about the telemarketing industry because it does not mention a single telemarketing company but instead discusses a telephone company, consulting firm, Calling Name (CNAM) company, enhanced service providers, and himself. Fredericks responds that those entities – International Telephone, Pacific Telecom, Telephone Management Corporation ("TMC"), and CallerId4U (collectively "Telemarketing Entities") – are of public interest because they facilitate an illegal scheme to enable others to conduct telemarketing calls and share the CNAM revenue generated through those calls. Fredericks's Decl., Ex. 1 (Blog), pp. 110, 180. To that extent, the Blog clearly concerns the public interest.

Accuardi also argues that even if his clients were associated with the Telemarketing Entities, his status as their attorney is not a topic of public interest because he has no control over their decisions. He claims that the Blog exaggerates his involvement with these clients, as he only represents them in legal matters. In support, he points to several pieces of evidence. First,

the state corporate filings for Pacific Telecom and TMC do not list him as an officer. Sexton

Decl. (docket #13), Exs. 1 & 4. Second, his father, Fred Accuardi, the president of Pacific

Telecom and principal shareholder of International Telephone, states that Accuardi "has never

owned directly or indirectly any interest" in and "has never been and is not currently employed

by" Pacific Telecom and "has never received compensation" from either company. Response

(docket # 19), Ex. 25 (Fred Accuardi Aff.), ¶¶ 3, 5, 6, 8-11. Third, a shareholder of CallerID4U,

Luis Martinez, states that he has never done business with Pacific Telecom and that Accuardi,

whom he has never met, has never owned, been employed by, or received compensation from

CallerID4U. *Id*, Ex. 27 (Martinez Decl.), ¶¶ 3-8. Fourth, on September 6, 2013, Tonya Hetzler,

Investigator for North Dakota's Consumer Protection & Antitrust Division, whose affidavit

Fredericks references in his Blog, retracted her opinion that Accuardi was the "principal owner"

of International Telephone. Response, Ex. 5. Finally, Accuardi swore in an affidavit dated

April 8, 2013, and filed in a case in New York state court, that he was never "an officer, director,

shareholder, principal, agent, employee, member or manager of" Pacific Telecom or

International Telephone. Second Sexton Decl. (docket #29), Ex. 2, ¶ 5.

However, Fredericks points to other evidence that Accuardi is affiliated with the

Telemarketing Entities. Accuardi states in his own declaration, as confirmed by his father, that

although he received no compensation, he signed contracts as the Vice President and General

Legal Counsel of International Telephone. Motion (docket #18), Ex. 2 (Accuardi Decl.), ¶ i;

Fred Accuardi Aff., ¶ 10. In fact, International Telephone's form revenue-sharing agreement

lists Accuardi as Vice President and General Counsel. Fredericks Decl., ¶ 15 & Ex. 6. He has

corresponded with governmental units and third parties regarding the Telemarketing Entities

without any indicia of his nonemployee affiliation and with the purported authority to act on

their behalf.  Accuardi Decl., Exs. 2, 3, & 26.  Finally, several pieces of evidence suggest joint control of TMC, International Telephone, and Pacific Telecom:  (1) for both TMC and International Telephone, Accuardi uses the same email address (interlaw@justice.com) (Fredericks Decl., Ex. 6, p. 3; Accuardi Decl., Ex. 2, p. 8); (2) the Sheriff's office in Hernando County, Florida, discovered that the domain for Pacific Telecom's Internet website is registered to TMC (Fredericks Decl., ¶ 16 & Ex. 7, p. 11); and (3) the United States headquarters of TMC and International Telephone is also Accuardi's legal office, located at 2331 SW 5th Avenue, Portland, Oregon, 97201.  *Id*, ¶ 12 & Ex. 5, p. 6; Accuardi Decl., Ex. 6.

Regardless of Accuardi's role in management of the Telemarketing Entities, Accuardi's undisputed position as legal counsel for TMC, Pacific Telecom, and International Telephone makes him a subject of public interest.  Substantial assistance in violations of telemarketing laws is a violation of Federal Telemarketing Sales Rule.  16 CFR § 310.3(b) ("It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer.").  Many states, including North Dakota, have similar provisions.  Tax documents show Accuardi received income as an attorney from International Telephone in 2012 and TMC during the period of 2010-2011.  Accuardi Decl., Ex. 6.  Accuardi represented TMC in responding to a subpoena from the North Dakota Attorney General's office.  *Id*, Ex. 2, p. 8 ("Please do not hesitate to call on us if we can be of any further assistance in this matter.  If you provide the number of the complainant [then] TMC can advise its client to remove that person from its call list.").  The Attorney General's Office also addressed to Accuardi the notice of Pacific Telecom's potential violation of North Dakota law for assisting International Telephone in confirmed violations.  *Id*, Ex. 3, p. 2.  Any alleged involvement of Accuardi that encourages illegal telemarketing practices is a public issue.  Thus,

Fredericks's Blog would potentially expose entities that are violating federal law as accomplices to illegal telemarketing practices.

Finally, Accuardi relies on this court's decision in *Obsidian Fin. Grp., LLC v. Cox*, CV-11-57-HZ, 2011 WL 5999334, *6 (D Or Nov. 30, 2011). In that case, the defendant published statements on the Internet that the plaintiff had committed tax fraud while administering assets as a court-appointed trustee in the bankruptcy proceedings of a private corporation. The court found that those statements were not a matter of public concern because they did not involve a question for public discourse, but strictly related to the handling of a private company's bankruptcy affairs, citing *Gertz v. Robert Welch, Inc.*, 418 US 323, 350 (1974). The focus of Fredericks's statements about Accuardi, unlike those about the plaintiff in *Obsidian*, is how Accuardi's involvement with the private company affects the public. Fredericks's scrutiny is not limited to the private management of the Telemarketing Entities, but questions how that management resulted in alleged robo-calling to the citizens on the National Do Not Call Registry and violations of federal and state law. More importantly, the Ninth Circuit disagreed with this court's conclusion in *Obsidian* that the allegations of tax fraud were not a public issue because "[p]ublic allegations that someone is involved in crime generally are speech on a matter of public concern." *Obsidian Fin. Grp., LLC v. Cox*, 12-35238, 2014 WL 185376, at *5 (9th Cir Jan. 17, 2014). As explained above, Fredericks's statements implying that Accuardi is violating the law involve a matter of public concern. Thus, Fredericks has met his initial burden.

## II.    <u>Accuardi's Burden</u>

To survive the Anti-SLAPP motion, Accuardi must produce substantial evidence to support his claims. "Because it goes beyond the pleadings to examine the evidence in support of the plaintiff's claims, a special motion to strike bears many of the characteristics of a motion for

summary judgment." *Staten*, 222 Or App at 30, 191 P3d at 788. "That burden is potentially much heavier than merely establishing the existence of a disputed issue of fact. In deciding whether the plaintiff has met its burden, the trial court may need to weigh the evidence, something that it cannot do on a motion for summary judgment." *Id* (citation omitted). "Finally, a judgment granting summary judgment as to all parties and all claims is a final judgment on the merits, whereas a judgment of dismissal following the grant of a special motion to strike is without prejudice to the filing of a new action." *Id.*

### A.    False Light (Count One)

Fredericks contends that the claim for placing Accuardi in a false light fails because his statements were all expressions of opinion. "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 US 1, 20 (1990) (citation omitted). Therefore, "statements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.'" *Standing Comm. on Discipline v. Yagman*, 55 F3d 1430, 1438 (9th Cir 1995); *see also Reesman v. Highfill*, 327 Or 597, 606, 965 P2d 1030, 1035 (1998) (applying to a defamation cause of action under Oregon law), citing *Milkovich*, 497 US at 20. The same First Amendment defenses that apply to defamation claims apply to false light claims. *Gardner*, 2005 WL 3465349, at * 8, citing *Time, Inc. v. Hill*, 385 US 374, 387-88 (1967), *Partington v. Bugliosi*, 56 F3d 1147, 1160 (9th Cir 1995) (rejecting false light claims "for the same reason that we rejected his defamation claims based on those statements: both statements are protected by the First Amendment, regardless of the form of tort alleged").

To determine whether Fredericks's statements are expressions of opinion or imply a false assertion of fact, a court must ask "whether a reasonable fact finder could conclude that

contested statement impl[ies] assertion of objective fact.  If the answer is no, the claim is

foreclosed by the First Amendment."  *Partington*, 56 F3d at 1153 (internal quotation omitted)

(alteration in original).

> To determine whether a statement implies a factual assertion, we examine
> the totality of the circumstances in which it was made.  First, we look at
> the statement in its broad context, which includes the general tenor of the
> entire work, the subject of the statements, the setting, and the format of the
> work.  Next we turn to the specific context and content of the statements,
> analyzing the extent of figurative or hyperbolic language used and the
> reasonable expectations of the audience in that particular situation.
> Finally, we inquire whether the statement itself is sufficiently factual to be
> susceptible of being proved true or false.

*Underwager v. Channel 9 Austl.*, 69 F3d 361, 366 (9th Cir 1995) (citations omitted).

As to the broad context, the tenor of Fredericks's Blog communicates that its content is

offered as opinion.  "Where the language of the statement is cautiously phrased in terms of

apparency, the statement is less likely to be understood as a statement of fact rather than a

statement of opinion."  *Info. Control Corp. v. Genesis One*, 611 F2d 781, 784 (9th Cir 1980).  In

bold, red type, the Blog apprises readers that it "is a journalistic endeavor . . . and is published to

provide consumers with news and commentary regarding the telemarketing industry.  Every

effort is made to ensure the accuracy of the information presented here and all statements are

made in good faith with the belief that they are correct."  Blog, p. 195.[3]  Fredericks cites some of

the numerous examples of how he presented the content in "terms of apparency," including:  "In

my personal opinion, Pacific Telecom is clearly in violation of the Telemarketing Sales Rule.

What do you think?" (*id*, p. 37); "These facts are a clear indication that Pacific Telecom and its

leaders Steve Hamilton, F. Antone Accuardi and Fred Accuardi are likely in violation of a

number of laws, including 16 C.F.R. § 310.3(b)" (*id*, p. 115); and "It is plausible that Telephone

---

[3] In the Blog filed with the court, this language appears only in the January 30, 2013 post.  Now, however, this language is the first entry on the Blog's website.

Management Corporation connects telemarketers with Pacific Telecom.  However, if both companies share the same 'General Legal Counsel,' it would seem odd that Pacific Telecom has absolutely no knowledge about the telemarketers who use their phone network." *Id*, p. 32.

On the other hand, Accuardi points to the Blog's repeated links to Oregon Department of Justice ("DOJ") and the Oregon State Bar ("OSB") websites as proof of Accuardi engaging in illegal conduct.  Yet these links simply replicate complaints filed with the entities (*id*, p. 16), quote the websites (*id*, p. 23), or inform readers where they may file consumer complaints.  *Id*, pp. 5-6, 119.  The post dated May 30, 2012, lists several complaints against Pacific Telecom from an Oregon state data storage website, quotes a DOJ article about telemarketing becoming the top consumer complaint, and states that "Pacific Telecom Communication Group's '3rd party telemarketers' contribute to making telemarketing the #1 consumer complaint in Oregon." *Id*, p. 23.  This statement hardly implies that Accuardi committed a crime, and the fact that it does imply – that Pacific Telecom contracts with telemarketers violating the law – is posed throughout the Blog as Fredericks's theory.  Even in this post, he quips that "Pacific Telecom claims that they do not initiate any outbound telemarketing calls, so it's not their fault that their 'contractors' engage in illegal unsolicited telemarketing, right?" *Id*.

Fredericks argues that it is impossible to complete the final two steps in the *Underwager* analysis because Accuardi has not identified any specific statements that imply false facts.  The thrust of Accuardi's claim is indeed based on the cumulative effect of the Blog, but paragraph 6 of the First Amended Complaint does quote the Blog and paraphrase other language used by Fredericks as allegedly false statements:

> (A) "Antone Accuardi is engaged in a world wide conspiracy to perpetuate, encourage, profit and engage in illegal telemarketing for reasons that range from 'to steal personal information' from unsuspecting consumers or to receive CNAM (Caller Name) revenue or 'dip' fees from

other telecommunications providers for access to various information data bases."

(B) "F. Antone Accuardi is an owner, officer, employee and or general counsel (referring to salaried corporate counsel) of each of the companies alleged to have engaged in and or conspired to engage in patterns of illegal telemarketing and that has devised a global scheme to funnel ill-gotten gains to a series of offshore companies and bank accounts in effort to hide his and his co-conspirators true identities and to avoid prosecution from authorities."

(C) "Antone Accuardi is being prosecuted by the Federal Trade Commission ('FTC') and state agencies, most notably the North Dakota Attorney Generals Office, for his alleged participation is [sic] such illegal telemarketing schemes and various violations of state law relating to illegal telemarketing."

(D) "Antone Accuardi recently closed down PTCG and is now currently owner and operator of CallerID4U and unrelated CLEC ('Competitive Local Exchange Carrier') licensed as such in the state of Washington and owned by Louis Martinez, Mr. Accuardi's new 'puppet' and continues to engage in illegal telemarketing." That Accuardi engages in conduct detrimental to the administration of justice and otherwise ignores his bar organizations Rules of Professional Conduct by engaging in and directing illegal activity.

(E) Antone Accuardi engages in a systematic pattern of violating Federal laws including, but not limited to, the Telephone Consumer Protection Act ("TCPA"), the Telemarketing Sales Rules ("TSR's") by, among other things, placing calls in, or encouraging other to place calls in violation of state and Federal "Do Not Call Lists" et. al.

(F) Antone Accuardi posted a reply to one of Defendant's published statements using an email address with an **ftc.gov** extension (Federal Trade Commission) and is currently being sued in a class action law suit in Southern California.

(G) FTC receives nearly One Million Telemarketing complaints involving F. Antone Accuardi.

(H) Accuardi is the mastermind behind various illegal telemarketing "schemes."

The court has been unable to find any of the alleged language, quoted or not, in the Blog, and Accuardi does not provide the dates when any of these statements were posted in the Blog. Even so, the alleged statements mirror some of the Blog's content. Therefore, as all the evidence beyond the pleadings must be considered, the court will scrutinize the specific context and content in Fredericks's treatment of the topics falling within these allegations.

13 – OPINION AND ORDER

As Fredericks correctly notes, the statute of limitations for a false light claim is one year, the same as for a defamation claim. ORS 12.120(2); *Magenis v. Fisher Broad., Inc.*, 103 Or App 555, 559, 798 P2d 1106, 1109 (1990). Because this case was filed on October 14, 2013, only the Blog posts after October 14, 2012, are actionable. However, the Blog posts after its inception in May and before October 14, 2012, may be considered as evidence to support Accuardi's claims as to the falsity of the postings that fall within the one-year statute of limitations.

Accuardi generally argues that Fredericks's use of hypothetical language should be ignored because all his defamatory statements are based on incomplete or erroneous sources. In support, he cites the following statement by the United States Supreme Court:

> Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich*, 497 US 18-19.

The Ninth Circuit is guided by section 566 of the RESTATEMENT (SECOND) OF TORTS "which distinguishes between two kinds of opinion statements: those based on assumed or expressly stated facts, and those based on implied, undisclosed facts." *Yagman*, 55 F3d at 1439.

> The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts. Moreover, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea; readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.

*Id* (citations and internal quotation omitted).

All of Fredericks's statements about Accuardi's alleged involvement with illegal telemarketing are based on disclosed sources and facts. Thus, those statements are defamatory only if the facts relied on are false and demeaning.

First, Accuardi alleges that Fredericks improperly relies on the affidavit of Tracy Hetzler, the investigator for the North Dakota Attorney General's Office (Sexton Decl., Ex. 2), in asserting that Accuardi has violated federal and state law as an agent of the Telemarketing Entities. First Amended Complaint, ¶ 6(A)-(B), (E). Fredericks obtained that affidavit in October 2012 when he downloaded public documents pertaining to Pacific Telecom case PU-12-750 from the North Dakota Public Service Commission's website. Fredericks Decl., ¶ 9. According to Accuardi, Hetzler misstated facts in her affidavit which Fredericks further misrepresented.

On October 2, 2012, Fredericks posted a link to Hetzler's affidavit, stating that: "The Attorney General's office describes conduct that suggests a willful and blatant disregard for State and Federal law," including that "Pacific Telecom was notified of the illegal activities associated with their services as far back as February 3, 2011, yet has failed to halt activity in any meaningful way. Their facilitation of this activity constitutes a violation of N.D.C.C. § 51-15-02.3." Blog, p. 119. Accuardi contends that this statement is false.

In her October 3, 2012 affidavit, Hetzler stated as follows:

> The North Dakota Attorney General's Office has repeatedly notified Pacific Telecom that its clients are engaging in violations of N.D.C.C. ch. 51-28 and 51-15. On February 3, 2011, January 26, 2012, and May 18, 2012, the Attorney General's Office wrote Pacific Telecom and provided copies of the complaints filed against Capital Solutions Group, S.A. and/or International Telephone Corporation. Pacific Telecom was warned that it was facilitating and assisting violations of North Dakota law in violation of N.D.C.C. § 51-15-02.3 by continuing to provide telephone numbers to clients that were violating North Dakota's Do Not Call law.

Sexton Decl., Ex. 2, ¶ 4.

Her affidavit further stated that "based on information and belief, Pacific Telecom has continued to facilitate and assist its clients in making telephone calls in violation of N.D.C.C." *Id*, ¶ 5.

Two of the three notices referenced by Hetzler dated February 3, 2011, and May 18, 2012, are not in the record. One notice dated January 26, 2012, is in the record and reads as follows: "We are advising [Pacific Telecom] that conducting business with these clients, after they are aware that they have violated North Dakota law, *may be considered* facilitating and assisting and *would be* a violation of North Dakota law." Accuardi Decl., Ex. 3, p. 2 (emphasis added). Although that notice is better characterized as warning Pacific Telecom of potential violations of North Dakota law, rather than stating, as Hetzler does, that Pacific Telecom "was facilitating and assisting violations of North Dakota law," Fredericks did not mischaracterize any fact. He correctly stated, based on Hetzler's affidavit, that the Attorney General's office notified Pacific Telecom of activities that would constitute a violation of North Dakota law.

Specifically with respect to Accuardi, the Blog cites Hetzler's affidavit for the statement that "Oregon attorney F Antone Accuardi 'is responsible for a large percentage of the illegal telephone calls made using Pacific Telecom's telephone numbers.'" *Id.* Hetzler later retracted the statement in her affidavit that "based on information and belief, Accuardi is a principal owner of International Telephone Corporate located in Belize, who is responsible for a large percentage of the illegal telephone calls made using Pacific Telecom's telephone numbers." Sexton Decl., Ex. 2, ¶ 6. But her retraction occurred on September 16, 2013, long after Fredericks's post, and was communicated to Accuardi through a private letter from Hetzler. Accuardi Decl., Ex. 5.

16 – OPINION AND ORDER

Thus, at the time of his post, Fredericks had no reason to believe that any portion of Hetzler's affidavit was false.

According to Accuardi, that same Blog entry contains another false statement that "Pacific Telecom is now operated by F Antone Accuardi." Blog, p. 119. On December 12, 2012, the Blog repeated that Pacific Telecom "is operated by Oregon attorney F Antone Accuardi," relying once again on the Hetzler affidavit. Blog, p. 123. Hetzler's affidavit states that "based on information and belief, it appears that the company is now being operated by individuals who are located outside the United States, including F. Antone Accuardi." Sexton Decl., Ex. 2, ¶ 6. Although Fredericks slightly rephrased this statement by Hetzler, he did not mischaracterize it. Again Fredericks disclosed the fact that formed his opinion and, at the time, that disclosed fact was reliable.

Second, Accuardi alleges that the Blog falsely states that the federal government and the North Dakota Attorney General's office are prosecuting Accuardi. First Amended Complaint, ¶ 6(C). The court can find no statements in the Blog implying that the FTC opened an investigation of or was prosecuting Accuardi's conduct. As to the North Dakota Attorney General's office, the Blog correctly notes that it had opened an investigation as evidenced by the Hetzler affidavit. However, the court can find no statements that the investigation had developed into a prosecution. Therefore, as far as this court can ascertain, the Blog does not state any false facts on this topic.

Third, Accuardi alleges the Blog implies that one million telemarketing complaints implicate him as the violator. *Id*, ¶ 6(G). On December 12, 2012, the Blog cited FTC data that "the FTC received 982,999 consumer complaints against telephone numbers belonging to Pacific Telecom." Blog, p. 122. Fredericks obtained that data from the FTC pursuant to a Freedom of

Information Act request.  Fredericks Decl., ¶ 7.  The Blog cited a disclosed fact which Accuardi has not proven to be false.  The Blog also links to its previous report that "the North Dakota Attorney General's office found that Pacific Telecom Communications Group is operated by Oregon attorney F. Antone Accuardi."  Blog, p. 123.  Again, this statement is based on Hetzler's affidavit, a disclosed fact that she has not retracted.

Fourth, Accuardi alleges that Fredericks reported facts on another website, 800notes.com, falsely implying that he engaged in money laundering.  First Amended Complaint, ¶¶ 5-6.  The statement at issue was made in a comment by "JD"[4] who wrote on the Blog that "F. Antone Accuardi, the apparent leader behind Pacific Telecom, is alleged to use his attorney trust bank account to move money to a foreign account controlled by him in the country of Belize. . . .  This appears to be blatant criminal act of money laundering."  Accuardi Decl., Ex. 7.  Fredericks claims he did not write the post, and Accuardi offers no proof that he did.  The post links to the Blog entry on August 17, 2012, which quoted the website of the Accuardi's former law practice, Interlaw Group.  That particular entry describes a "possible Accuardi telecom business based in Belize" that "could be totally unrelated to the unsolicited telemarketing calls associated with Pacific Telecom's phone numbers" or "reveals insights into how Pacific Telecom's services can be sold to telemarketers through the secrecy of a foreign shell company."  Blog, p. 82. Fredericks concludes the entry with a hypothetical description of how this shell operation would be set up, preceded by the disclaimer: "Once again, we have no specific knowledge of a conspiracy (criminal or otherwise), but theorize that it's possible."  *Id.*  Whether or not it can be proven that Accuardi committed a crime by laundering money, the weight of the evidence considered in the second step weighs heavily in Fredericks's favor.  The specific discussion is

---

[4] Although Accuardi believes that Fredericks refers to himself on 800notes.com as "JD" (Accuardi Decl., ¶ nnn), Fredericks has offered no evidence to support this belief.

clear that any shell operation is Fredericks's theory, and any reasonable reader would heed his direct request to "evaluate this information from a skeptical viewpoint and carefully draw your own conclusions." *Id.*

Fifth, Accuardi alleges that the Blog falsely implied he had violated ethical rules. First Amended Complaint, ¶ 6(D). On October 22, 2012, Fredericks posted: "The mounting evidence of F Antone Accuardi's active involvement in this scheme to profit from illegal telemarketing is of particular significance: as a licensed member of the Oregon State Bar, this conduct represents a serious violation of the rules of professional conduct," referring to a previous post in which he quoted Rules of Professional Conduct 4.1 and 8.4. Blog, p. 119. However, the "mounting evidence" cited is the Hetzler affidavit to which the Blog links. Also, that same posting concludes by reminding the reader that "no sanctions have been issued against Mr. Accuardi. . . . Any reports of professional misconduct involving F Antone Accuardi should include factual information relating to his activities, such as the affidavit from the investigator with the North Dakota Attorney General's office." *Id*, pp. 119-20. Thus, Fredericks was expressing his opinion based on disclosed facts that Accuardi had violated professional ethics rules.

Sixth, Accuardi alleges Fredericks's falsely implied that the owner and operator of CallerID4U, Louis Martinez, is Accuardi's "new puppet." First Amended Complaint, ¶ 6(D). The only mention of an association between CallerID4U and the Accuardi family is the posting dated January 22, 2013: "According to the Minnesota Attorney General's Office, CallerId4u is affiliated with Telephone Management Corporation, which is operated by Fred Accuardi of Pacific Telecom." Blog, p. 127. Luis Martinez declares that sometime in January or February 2013, the Blog contained the false statement "that CalleriD4U was Mr. Antone Accuardi's new conduit to engage in and profit from illegal telemarketing, with me as his new puppet of front

man." Martinez Decl., ¶ 9. That post no longer appears on the Blog. *Id.* Although Accuardi accuses Fredericks of deleting this statement from the Blog, Fredericks certifies that he produced to Accuardi in discovery all of the backup files containing all deleted material from the Blog. Second Fredericks Decl. (docket #33), ¶ 7. Accuardi has not submitted any deleted material from those backup files to prove that the allegedly false statement was ever posted.

Finally to the extent that Accuardi alleges that the Blog falsely implies he is "dishonest, a crook and incompetent attorney" (First Amended Complaint, ¶ 6), and the "mastermind" behind illegal telemarketing schemes (*id*, ¶ 6(H)), such implications are not susceptible to objective verification. As the Ninth Circuit said of the reference to an attorney as "shady," "[t]he inference that [Accuardi's] morality or legal abilities were doubtful, or that he was unreliable and disreputable, is a broad, unfocused, wholly subjective comment." *Lewis v. Time Inc.*, 710 F2d 549, 554 (9th Cir 1983). Although *Lewis* was decided before *Milkovich*, which delineated the contours of protected opinion, the Ninth Circuit reaffirmed its holding in *Yagman*, 55 F3d at 1440.

The only allegation in the Complaint based on a potentially actionable factual statement is the posting on January 28, 2013, that "[o]n December 19, 2012, a class action lawsuit was filed against Pacific Telecom Communications Group, F Antone Accuardi, Steve Hamilton and other associated entities." Blog, p. 174; *see* First Amended Complaint, ¶ 6(F). Accuardi has submitted evidence that his father, Fred Accuardi, and not he, was a named defendant in that action. Fred Accuardi Decl., ¶ 19.

The ultimate issue is whether Accuardi has submitted substantial evidence to support a false light claim. To state a claim for false light Accuardi must show "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and . . . (b) the actor has

knowledge of or acted in reckless disregard as to the falsity of the publized [sic] matter and the false light in which the other would be placed." *Dean v. Guard Pub. Co.*, 73 Or App 656, 659, 699 P2d 1158, 1160 (1985). The posting includes a link to the full class action complaint in *Astrahan v. Pac. Telecom Commc'n Grp.*, and an image of the caption. Blog, p. 174. The defendants in the caption include "Fred Anthony Antone Accuardi." *Id.* The complaint describes this defendant as the "principal owner, chief executive officer and general counsel of defendant International Telephone. Defendant Accuardi is also general counsel for Pac Telecom."[5] While Accuardi can now show that the complaint erroneously described his father as legal counsel for Pacific Telecom, Fredericks was hardly reckless in relying on this court filing. Accuardi's name is almost identical to his father's name, and Fredericks had received correspondence from Accuardi in which he identified himself as Pacific Telecom's "general legal counsel." Accuardi Decl., Ex. 26, p. 1. Thus, the only statement that asserts a false fact does not constitute substantial evidence of a false light claim.

### B.    Intentional Infliction of Emotional Distress (Count Two)

Accuardi alleges that Fredericks's Blog caused him to receive dozens of telephone complaints from consumers, including death threats, resulting in high blood pressure and headaches. First Amended Complaint, ¶¶ 31-32; Accuardi Decl., ¶ ii. He blames this harassment on Fredericks intentionally making false allegations against Accuardi "without any meaningful research into the veracity of such allegations" and "in retaliation for [Accuardi's] threat to sue Defendant as a result of their dissemination of false statements." First Amended Complaint, ¶¶ 32-33.

---

[5] While Accuardi only submitted the first page of the complaint in *Astrahan v. Pac. Telecom Commc'n Grp.*, the Blog links to the full complaint. *See http://telemarketerspam.wordpress.com/* (last visited Feb. 20, 2014).

"To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841, 849 (1995).

Intent means that a defendant desires to inflict severe emotional distress or knows that such distress is certain or substantially certain to occur. *Id* at 550. Fredericks's stated intent in publishing the Blog was to put pressure on the Telemarketing Entities and end illegal robo-calling practices, not to cause any injury to Accuardi. Fredericks Decl., ¶ 3. Fredericks never championed acts of violence or harassment of Accuardi himself. Instead, he repeatedly encouraged readers to make complaints to the appropriate authorities. *E.g.*, Blog, p. 195 ("PLEASE take 10 minutes of your time to submit an online complaint to State and Federal regulators so we can put an end to the damages that is being inflicted on the public.").

Nonetheless, Accuardi argues that the court can infer Fredericks intended to ruin his reputation as an attorney based on Fredericks's offer to negotiate a financial settlement before filing a formal complaint with the Vermont Attorney General for illegal telemarketing. Accuardi Decl., Ex. 26, p. 4. In fact, Accuardi initiated the correspondence with Fredericks that led to the settlement offer. He wrote to Fredericks on April 19, 2012, that he would file a lawsuit and levy his wages if Fredericks did not retract his complaint to the Oregon DOJ. *Id*, p. 1. Fredericks's complaint to the Oregon regulators that instigated this correspondence, as well as his threat to file a second complaint in Vermont, only confirms his intent to expose the illegal telemarketing in which he believed Accuardi was involved. Thus, this court cannot reasonably infer that Fredericks desired to inflict emotional distress on Accuardi.

22 – OPINION AND ORDER

The question then is whether Fredericks knew that such distress was certain or substantially certain to occur as a result of his Blog. Fredericks did not post Accuardi's telephone number on his Blog. He posted the contact information for federal and state authorities who received complaints of alleged illegal conduct. *E.g.*, Blog, pp. 5-6. Accuardi presents no evidence that Fredericks knew Accuardi was receiving harassing telephone calls, and Accuardi did not complain about the harassment during their communication in April and May of 2012. When Fredericks learned that readers of his Blog were harassing CallerID4U, he denounced the practice:

> For the record, no representative of the Telecom Compliance News Press has made any threats of physical harm, violence, or any other unlawful threats against CallerId4U. . . . We encourage our readers to refrain from any direct or perceived threat of violence towards CallerId4U or anyone else. Instead put your energy into complaining loudly and frequently to the regulators listed on this web site, who are responsible for enforcing telemarketing laws.

Blog, pp. 211-12.

Even if Fredericks's knowledge of the CallerId4U harassment made it substantially certain that other entities referenced in his Blog, including Accuardi, would receive similar treatment, Fredericks's conduct did not exceed the bounds of social tolerable conduct. The court must consider "whether the offensiveness of the conduct 'exceeds any reasonable limit of social toleration,'" which is "a judgment of social standards rather than of specific occurrences." *House v. Hicks*, 218 Or App 348, 358-59, 179 P3d 730, 736 (2008). Regardless of how far-fetched Fredericks's theories were about Accuardi's professional involvement, he presented them in a widely accepted way: through a personal Blog open to public commentary. He directed his frustration towards public discourse in a way that is constitutionally protected. Most

notably, he advocated for his readers to limit their action outside the Blog to available regulatory avenues.  Thus, Accuardi fails to meet his burden on this claim.

### C.     __Interference with Economic Relations (Count Three)__

Accuardi's last claim is that Fredericks's portrayal cost him prospective clients and professional relationships within the legal community.  In particular, a prospective client sought counsel from Accuardi in a medical malpractice case, causing Accuardi to solicit over a dozen attorneys with more experience in that area of law to associate with him as co-counsel.  Accuardi Decl., ¶ y.  After none would agree, a former classmate told Accuardi that he had refused because his law partners "did not want the association with an alleged criminal attorney."  *Id.*

To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."  *McGanty*, 321 Or at 535, 901 P2d at 844.

Fredericks argues that Accuardi fails to identify any prospective economic relationship other than hypothetical ones.  The essential purpose of the tort is to protect "*voluntary* economic relationships, both commercial and noncommercial, that would have very likely resulted in a pecuniary benefit to the plaintiff but for the defendant's interference."  *Cron v. Zimmer*, 255 Or App 114, 127, 296 P3d 567, 576 (2013) (emphasis in original).  Accuardi is not required to name the prospective relationships.  It is enough that he had the expectancy of future attorney-client relationships that would have very likely benefitted him.  *See Allen v. Hall*, 328 Or 276, 281, 974

P2d 199, 202 (1999) (en banc), citing *McGanty*, 321 Or at 535, 901 P2d at 844 (purely prospective interests, such as the expectancy of inheritance, are protected by the tort).

However, Accuardi fails to provide any evidence that Fredericks's Blog caused him to lose any expected attorney-client relationships.  The record does not show the source of his former classmate's information about Accuardi's alleged criminality.  Even if that information came from the Internet, it could have just as easily come from other websites that, according to Accuardi, contain false information about him.  Accuardi cites numerous complaints filed with the Oregon State Bar about his conduct, blaming Fredericks's Blog as the "tip."  However, none of these complainants identify themselves as prospective clients or Oregon attorneys, and the Oregon State Bar never initiated an investigation based on these complaints.  As a result, only the Oregon State Bar, Accuardi, and the complainants could have known about them.

In short, Accuardi cannot meet his burden because the conduct of which he complains arises from constitutionally protected speech.  He cannot demonstrate that Fredericks acted through improper means because there is "nothing improper, as a matter of law, about making statements that are protected by the common law and by the First Amendment."  *Gardner v. Martino*, CV-05-769-HU, 2005 WL 3465349, *12 (D Or Sept. 19, 2005), citing *Unelko Corp. v. Rooney*, 912 F2d 1049, 1058 (9th Cir 1990).

## **ORDER**

Fredericks's Amended Special Motion to Strike (docket #10) is granted, and Accuardi's claims are dismissed without prejudice.

DATED  March 4, 2014.

s/ Janice M. Stewart
_____
Janice M. Stewart
United States Magistrate Judge